# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

---

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:06-CR-338-010 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | ORDER & OPINION |
| | : | [RESOLVING DOC NO. 121] |
| IRFAN ITAYEM, aka IRF, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Defendant Irfan Itayem moves to suppress all evidence seized from warrantless searches conducted at his residence. Plaintiff United States of America opposes the motion. After conducting a hearing regarding this issue, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

I. Background

On May 2, 2006, Magistrate Judge Kenneth McHargh issued an arrest warrant for Defendant Itayem, finding probable cause that the defendant conspired to distribute and to possess with the intent to distribute cocaine. On May 3, 2006, at approximately 9:25 a.m., approximately ten officers attempted to execute the arrest warrant at Defendant's residence. Prior to the execution of the arrest warrant, officers were allegedly informed that the defendant was being arrested on drug-trafficking charges. Although the officers had an arrest warrant, they never obtained a search warrant for the

-1-

defendant's residence.

While the initial circumstances surrounding the officers' entry into the apartment are disputed, officers forcibly entered the residence and confronted the wife of the defendant. Other officers proceeded to search for the defendant throughout the remainder of the apartment. While searching for the defendant, an officer allegedly opened a hall closet and observed several rifles and two digital scales in plain view. The officer believed the weapons posed a threat to officer safety and assumed that both the weapons and the scales were evidence of a drug crime. At some point, the officers seized the weapons and scales as contraband and to ensure officer safety.

Defendant's wife spoke virtually no English and was significantly disturbed by the officers' intrusion into the defendant's apartment. Defendant had recently married his wife in Israel and brought her to the United States only a few days before the execution of the arrest warrant. After determining Defendant was not present within the apartment, the officers concluded that the defendant was likely at work. Approximately half of the officers then traveled to the defendant's nearby place of employment and executed the arrest warrant. In the meantime, the rest of the officers remained at the defendant's apartment with Defendant's wife. Upon taking the defendant into custody, the first group of officers brought the defendant back to his apartment.

The defendant and plaintiff maintain two very different versions of subsequent events. Defendant claims that he was stopped at the door to his apartment and refused permission to enter. He alleges that he could see some of his belongings had been strewn about the living room floor. Defendant claims that he was told a search warrant could easily be obtained and that things would go much easier for him and his wife if he simply consented to the search. In order to calm his hysterical wife who had only recently arrived in the country and after numerous requests by the

officers, the defendant acquiesced and signed the consent form. Defendant notes that while the consent form was signed at 9:58 a.m., the Inventory Sheet had been signed by the Inventory Officer and Incident Supervisor at 9:25 a.m., arguably demonstrating that the search had concluded prior to obtaining the consent of the defendant. At no point in time did the officers present a search warrant to the defendant.

The government contends that before the officers travelled to Defendant's place of employment, the defendant's wife provided officers with the telephone number of the defendant's mother. The officers allegedly called Defendant's mother to request that she come to assist the defendant's wife. While some of the officers traveled to Defendant's workplace to execute the arrest warrant, the other half of the officers remained at Defendant's apartment, allegedly waiting for Defendant's mother to arrive so she could assist the officers in explaining the situation to the defendant's wife.

The plaintiff claims that after returning Defendant to his residence they removed the defendant's handcuffs at his request and permitted him to enter the apartment to speak with his wife and mother. Shortly thereafter, officers re-advised the defendant of his rights and requested that he consent to a search of the apartment. Officers allege that the defendant consented to a complete search of his apartment in writing by executing both an Advice of Rights form and a Consent to Search form. The defendant then informed the officers that a handgun was located in the bedroom, which the officers later retrieved.

The defendant denies that the police ever called his mother and contends that he was only permitted to contact his mother after he signed the consent to search form. After the defendant provided his consent, the officers completed a search of the residence and secured numerous other

evidentiary items. In total, the officers seized three shotguns, a rifle, two digital scales, a pipe, a mirror and aluminum foil containing suspected residue, as well as other items.

## II. Legal Standard

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the person or things to be seized." The Fourth Amendment's prohibition against unreasonable searches and seizures forbids most warrantless searches. *See Katz v. United States*, 389 U.S. 347, 357 (1967) (stating that warrantless searches are "per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions"). Searches to which the defendant consents are among the exceptions to this rule. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

Regardless, an otherwise valid consent may not be sufficient to render a search constitutional if it follows from prior government misconduct. In such circumstances, the unlawful conduct "taints" the later-given consent. *United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003) (unlawful seizure taints later consent); *United States v. Buchanan*, 904 F.2d 349, 355 (6th Cir. 1990) (unlawful presence on property taints later consent).

In *Steagald v. United States*, the Supreme Court noted that "[t]he purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search." 451 U.S. 204, 213 (1981). The *Steagald* Court distinguished the purpose of arrest warrants from the purpose underlying search warrants: "An arrest warrant . . . serves to protect

an individual from an unreasonable seizure. A search warrant, in contrast . . . safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *Id.* Therefore, the Court noted that "whether [an] arrest warrant . . . adequately safeguard[s] the interests protected by the Fourth Amendment depends on what the warrant authorize[s] the agents to do." *Id.*

The only doctrine explicitly permitting government agents to remain on the property following an arrest is that enunciated in *Maryland v. Buie*, 494 U.S. 325 (1990). There, the Supreme Court examined whether law enforcement officers could conduct a protective sweep of areas near a defendant subject to arrest. In recognizing, but also cabining, the ability of officers to conduct such a protective search, the Court held that such a sweep must "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. at 335-36. Thus, the only doctrine permitting government agents to linger following the execution of an arrest warrant expressly limits both the purpose of such lingering (to ensure the officers' safety) and the permissible time of such lingering ("no longer than it takes to complete the arrest and depart the premises").

### III. Analysis

The Court finds that the officers had a right to enter the house in order to execute an arrest warrant. Likewise, upon entering the premises, the officers had a right to ensure both that the defendant was not present and that there were no weapons in immediate proximity to Defendant's wife. Therefore, the officers had a right to open the closets contained within the apartment to search for the defendant and to examine closets that were in close proximity to the defendant's wife.

However, after the officers' initial inspection of the apartment revealed that the defendant was not present, the officers had no right to remain in the apartment and had an obligation to leave the premises. Likewise, the Court finds that any consent given at a later point in time was invalid because it was improperly motivated by the circumstances surrounding the officers' delivery of the defendant to his apartment while the defendant's wife had been kept in an emotional state.

The plaintiff argues that the officers had a right to remain in the defendant's apartment in order to interview a witness. The Court does not credit the officers' testimony that they obtained the defendant's mother's phone number from the defendant's wife. It is illogical to assume that the defendant's wife would be aware of, let alone capable of recalling the defendant's mother's phone number and providing this number to the police only days after arriving in the United States. Likewise, the Court finds that the officers were unable to interview the defendant's wife at that time due to her inability to speak and understand the English language.

The plaintiff also argues that the officers remained in the apartment because they were legitimately concerned about the welfare of Defendant's wife and wanted to ensure that her mother-in-law would arrive to explain the situation. However, the defendant was never permitted to call his wife on his cell phone to calm her or provide her with any form of explanation. Likewise, the officers candidly testified that they returned the defendant to his home instead of taking him to a police station in order to obtain his consent to search. In addition, the officers never attempted to obtain his consent for a search until after they arrived at his apartment and the defendant could witness the chaotic scene unfolding. Thus, the Court finds that the officers had no legitimate reason for remaining in Defendant's apartment while other officers left to effectuate the arrest warrant.

Therefore, the Court **GRANTS** Defendant's motion to suppress all evidence of anything

obtained in the search subsequent to the initial walk-through in pursuit of the defendant. In addition, the Court suppresses the weapons found within the closet during the initial search. The indictment does not charge Defendant Itayem with possession of a firearm by a convicted felon because the weapons are not in and of themselves illegal. Whereas officers may have a limited right to temporarily seize weapons if they have a reasonable and articulable concern regarding officer safety, the officers had no right to be present in the defendant's apartment after the initial search revealed that the defendant was not at the location. As the weapons are not contraband, any evidence of their discovery shall be suppressed.

Although it presents an extremely close question, the Court finds that the two digital scales could immediately be suspected of being contraband. As such, the Court **DENIES** the defendant's motion to suppress evidence regarding these items.

IT IS SO ORDERED.


Dated: November 2, 2006                 s/      *James S. Gwin*
                                        JAMES S. GWIN
                                        UNITED STATES DISTRICT JUDGE